INHABITANTS OF CARONDELET, Respondents, *vs.* DENT, Appellant.

1. A confirmation with an official survey, under the act of 1836, is a better title than the confirmation of commons to the inhabitants of Carondelet by the act of 1812, without an approved survey.

*Appeal from St. Louis Court of Common Pleas.*

This was an action of ejectment, begun by the respondents in 1842, to recover lot number forty-one of the subdivisons of the commons of Carondelet, south of the River Des Peres. The title of the plaintiffs was as follows :

On the 6th of December, 1796, John B. Gamache, on behalf of the inhabitants of the village of Carondelet, presented a petition to lieutenant governor Trudeau, asking an extension of their common fields for himself, so as to embrace a tract of land, bounded by that of Gabriel Constant and the Mississippi and the River Des Peres.

On the 7th of December, 1796, lieutenant governor Trudeau replied to this petition, " that the land petitioned for *had been reserved for the necessary supply of wood to the village,* and the demand of Gamache, as well as the concessions granted in the direction of a line taken from the end of the village common fields, and running parallel to the Mississippi one hundred and fifty arpens lower, could not take place."

On the 5th of December, 1797, Antoine Soulard, surveyor

of Upper Louisiana, gave a certificate of survey, stating that, on the 21st of December, by virtue of an order directed by the lieutenant governor to Mr. De Treget, captain-commandant of said village, to enjoin upon the inhabitants to make known the line of a tract of land which had been granted to them under date of December 7, 1796, which line was to be parallel with those of Antoine Reilhe and Alvarez, he had proceeded, in the presence of said inhabitants, to make said survey. By consent of the inhabitants, he commenced at the last butt set at the extreme part or depth of their land, which had been previously surveyed by Mr. Pierre Chouteau, by virtue of an order from the lieutenant governor. The course of the western line of the common fields, he found to be S. 28° W. " I followed the course S. 28° W. 23 arpens 3½ perches, at which distance I found the River Des Peres. The end of the line, on the border of said river, has been marked with a stone, having for witnesses two flints, and a bullet of lead flattened ; the land of said Alvarez being about twenty-four feet distant from said stone, in running the line further in a parallel direction. In order that the said inhabitants may prove the same, I have delivered these presents."

On the 18th of February, 1806, Soulard gave a certificate that the inhabitants of Carondelet had again called upon him to measure or cause to be measured, a part of their commons ; that he had deputed Mr. B. Cousin to execute this survey, but that it had not been done, in consequence of finding his compass out of order."

On the 7th of June, 1808, the inhabitants of Carondelet filed with the recorder of land titles a notice of their claim to six thousand arpens, which is set out in the opinion of the court. The petition of Gamache, the reply of Trudeau, and the survey and certificate of Soulard, were filed with this notice, as evidence of their title.

On the 2d of January, 1812, the old board of commissioners rejected the claim for confirmation. The testimony of Au-

19—VOL. XVIII.

guste Chouteau, sr., and J. B. Provenchère, was taken by the commissioners, and the minutes of it, as preserved in the record of their proceedings, were read in evidence on the trial of this cause, the defendant objecting. These witnesses stated that the inhabitants of Carondelet, from about the year 1770, made use of the land below the field lots and village, along the Mississippi, as their commons, and took therefrom their fencing and fuel; but their testimony does not show the location and extent of the land thus used, nor is it expressly stated that any land south of the River Des Peres was thus used.

All the foregoing evidence of the plaintiffs' title is comprised in the record of the proceedings upon the claim before the old board of commissioners, which was offered in evidence.

The plaintiffs also gave in evidence Brown's survey of the Carondelet commons, made on the 17th of March, 1834; the record of the incorporation of the inhabitants of Carondelet, on the 20th of August, 1832; and a map of the subdivisions of that portion of the Carondelet commons *lying* south of the River Des Peres.

The defendant's title is as follows:

On the 15th of March, 1789, Don Manuel Perez, lieutenant governor, granted to Gabriel Cerré and his heirs, ten arpens in front by forty in depth, of land on the River Gravois, that empties into the Des Peres. This grant was confirmed by the act of congress of July 4th, 1836, and was duly surveyed by the United States, and the land sued for is within the said survey. The confirmation was to the defendant, as the legal representative of Cerré.

The defendant gave in evidence the grants and confirmations to Julien Chouquette, Gabriel Constant, Pierre Delor De Treget and Sophia Bolaye, all within Brown's survey of the commons. The concession to De Treget was dated December 6, 1796, and was for land south of the River Des Peres.

The defendant also introduced various letters and documents from the commissioner of the general land office, showing that

Brown's survey was disapproved, for the reason that Caronde-
let had no title to commons, south of the River Des Peres.

The plaintiffs, in rebuttal, introduced the following evidence :

1. The grants by Trudeau to Eugene Alvarez, in 1796, and
to Colgan, in 1797, for the purpose of showing from recitals,
and the proceedings before the board of commissioners, on
those claims, the recognition of the commons south of the River
Des Peres.   To their admission, the defendant objected.

2. The report of the surveyor general to the commissioner
of the general land office, with the affidavits taken by him, to
show an user of commons south of the Des Peres ; to the admis-
sion of which, the defendant objected.

3. Rector's plat of survey, made prior to 1817, of the land
south of the Des Peres, as commons ; to the admission of which,
the defendant objected, on the ground that it was not approved,
and never was considered the official survey.

4. Oral testimony, tending to show that the inhabitants of
Carondelet had used some part of the land south of the Des
Peres as commons, for cutting wood and mowing hay, prior to
1820 and since ; that when Brown, in 1834, surveyed the tract
south of the Des Peres, he found two old stone bounds one
hundred and fifty arpens south of the common fields—one at
the end of the line, and the other at the Mississippi ; and that
there were blazed trees along the line, which appeared to have
been blazed for a long time.

5. Adolph Renard stated that Brown's survey was approved
by the surveyor general, but disapproved by the commissioner
ot the general land office.

Under the instructions of the court below, the material one
of which is contained in the opinion, there was a verdict and
judgment for the plaintiffs, from which the defendant appealed.

*J. Spalding*, *F. M. Haight* and *B. A. Hill*, for appel-
lant.   I.   There is no confirmation south of the River Des
Peres.   4 Howard, 446.   1.   There is no concession.   The
answer of the lieutenant governor to Gamache's petition is not

one. How can a statement made *inter alios* that the land had been reserved, vest title in the village? 2. There was no survey under the former government, except as to the part north of the Des Peres. 3. There is no such *user* proved, as makes an inchoate title under the Spanish government. 6 Mo. Rep. 521. 7 ib. 14. 4. The pretended grant is altogether uncertain, and ought not to hold against the government; (3 Caines, 306. 3 Pet. 96. 6 Pet. 738. 11 Pet. 544. 5 Wheat. 359. 8 Porter, 9;) much less against a previous concession that is certain, and has been confirmed. II. If there be a confirmation of commons south of the Des Peres, it does not cover the Cerré tract. 1. The Cerré tract was granted long first, and was improved, cultivated and built upon under the Spanish government. 2. Seven inchoate titles are within Brown's survey, one of them as late as December 6, 1796. These show that, though the villagers cut wood, got hay, &c., on that land, yet the title was held by the government and subject to its disposal. 3. Cerré held adversely to the village, and this was known to the villagers and government authorities. III. The claim of the plaintiffs before the board was for 6000 arpens. They were required by law to state in the notice the extent of their claim. Having done so, are they not estopped to claim beyond it? If so, Brown's survey is altogether wrong. A survey may be impeached by third parties claiming land lying within it. 8 Howard, 313, 314. IV. Brown's survey is no evidence of the extent and boundaries of the plaintiffs' claim, having been disapproved by the commissioner of the general land office. This was a case that called for the interference of the general land office. The survey included more than was claimed. The act establishing a general land office (2 U. S. S. 716) and the act regulating the general land office (5 U. S. S. 107) contemplate a supervision and control, to be exercised by the commissioner of the general land office, over the surveying, &c., and how can that be done, unless he can set aside a survey and order a new one?

*C. C. Whittelsey*, for respondents.   It cannot be questioned, that the confirmation of the title to the commons of Carondelet gives the plaintiffs a title better than that of the defendant, if the land sued for is embraced within the tract confirmed by the act of 1812.   The main question at issue is, what land was confirmed, what were its boundaries, and did it cover the land sued for ?   1.   The respondents contend that the survey of Rector, made in 1817, and that of Brown, made in 1834, are conclusive upon the appellant claiming under the act of 1836.   *Les Bois* v. *Bramell*, 4 Howard, 449, 457, 463.   *Jourdan* v. *Barrett*, 4 Howard, 184.   *Bissell* v. *Penrose*, 8 Howard, 339.   *Menard's heirs* v. *Massey*, 8 Howard, 313.   If this be so, there is an end of the case, although the court below threw the plaintiffs upon the documentary evidence of title, as filed with the board of commissioners, and then declared the extent of the grant.   2.   If the court below was correct in throwing aside the surveys, then the instructions correctly declared the extent of the grant, as shown by the letter of Trudeau to Gamache.   This letter was the action of a public officer, and when the grant itself cannot be produced, is good as secondary evidence.   3.   The survey of Rector, made in 1817, retraced by Brown in 1834, was a legally approved survey, and the government is estopped from afterwards interfering with it.   It was made by an officer of the United States, and remained unquestioned until 1840.   It is not denied that the superior officers of the land department have the right to review the action of their inferiors, but this power must be exercised within a reasonable time ; for no proposition could be more monstrous, than that the government should forever retain the authority to destroy titles.   The approval of the surveyor general, once made, binds the government, unless an appeal is taken within a reasonable time and his decision reversed.   The survey must be considered as legally made, when approved by him.   2 Lands, Laws, Opinions, &c., p. 890.   No. 876.   Letter of Commissioner to Surveyor General of Mo. and Ill., Sep. 4, 1828.   *Menard's*

*heirs* v. *Massey*, 8 Howard, 313. The question of reasonable time is for the courts, but in this case there can be no pretence that any appeal was taken within any thing like reasonable time.

SCOTT, Judge, delivered the opinion of the court.

1. From the evidence in the record, the survey of Brown is out of the question. That survey, from the correspondence preserved, it appears, has been disapproved by the authorities of the general government. The facts upon which that act rests for its authority are not stated with sufficient fulness, in order to enable this court to determine whether it has any warrant in law. None of the regulations of the department, in relation to public surveys, are set forth, nor are the practices and usages of the government, in regard thereto, spread out. In a question of so much importance, it is necessary that a court should be possessed of every circumstance which can affect its judgment. The power of the civil authorities of the federal government to disapprove surveys, the mode in which that disapproval is to be expressed, whether long acquiescence is not evidence of approval, and whether, at any length of time, at the interested suggestions of others, surveys may be set aside, are questions in which the people of St. Louis county feel a deep and anxious solicitude, as involving the security of the titles to large and valuable estates. The judgments of the highest tribunals known to the law are sacred after the end of the term at which they were rendered. A survey is an adjudication or setting apart a portion of the public domain in pursuance to a grant which has been made by the government. If, after a survey has been made, it may at any length of time be set aside, at the suggestions of interest or cupidity, there can be no security for titles resting on surveys. The statute of limitations itself would afford no protection. The existence of such a power or pretension in the executive should be known,

in order that the legislative department may apply a corrective to the evils of its exercise. Situated as this case is at present, we will not enter into this question, as it is not necessarily before us, but will confine our attention to the point on which the cause turned in the court below.

The principal instruction, it is supposed, which influenced the jury in the formation of their verdict, was the fifth in order of those asked by the plaintiff, viz : That the acts of congress of the 13th June, 1812, and 27th January, 1831, confirmed to the inhabitants of the village of Carondelet, all the land lying south of the common fields of Carondelet, between the Mississippi river and a line run from the south-west corner of the common fields running on the line commenced by Soulard S. 28° W. one hundred and fifty arpens, saving previously confirmed claims and complete French and Spanish grants."

The survey of Brown being excluded from our consideration, we are thrown upon the terms of the donation and the circumstances under which it was made, in order to ascertain the situation and extent of the commons granted to the inhabitants of Carondelet, by the act of the 13th of June, 1812. This case, then, viewed as disconnected with the survey of Brown, is unlike both those of *Chouteau* v. *Eckart*, and *Mackay* v. *Dillon*, 2 and 4 Howard. In the case of *Chouteau* v. *Eckart*, the claim of the village of St. Charles to commons was involved. That claim was for a definite number of arpens ; it was inclosed under the Spanish government, and there was possession up to the lines of inclosure after the change of government. So the boundary was definite and specific, and the title of Chouteau did not accrue until the 4th of July, 1836, long after the confirmation. In the case of *Mackay* v. *Dillon*, in which the extent of the St. Louis commons was in question, there was a survey accompanying the claim, as laid before the board, and a definite number of acres claimed. Those commons were surveyed in 1832, prior to the confirmation of Mackay in 1836. Here were definite boundaries, claim confirmed and

surveyed, before the opposing title originated. If the federal government makes a grant and puts the grantee in possession, one deriving title subsequently from the same source, cannot controvert the right or disturb the limits of the first grantee. Coming in subsequently, the last grantee succeeds only to the rights of the United States, and as they acquiesced in the first survey, there is no authority or right in any subsequent claimant to disturb it. But where a grant is made with undefined limits, and there is no survey, if a subsequent grant is made with prescribed bounds, the first grantee must show that the second grant is within the limits of the first, according to the evidence of his title, if he would turn him out of possession.

One cannot but remark on the inclination in corporations, in their dealings with others, to depart from the old maxim, so salutary in its operations in the intercourse of society, " live and let live." Carondelet claimed but six thousand arpens from the United States, every foot of which has been conceded to her, and yet not satisfied, by almost doubling her pretensions, she would deprive others of their rights, whose claims are as meritorious, if not more so, than her own. Coming in under such circumstances, she cannot complain if those whom she would deprive of their possessions, should institute a strict scrutiny of her claims.

We do not consider that we are warranted in regarding the demand of Carondelet as falling within the principle, that the certainty of metes and bounds will include and pass all the lands within them, though they vary from the given quantity expressed in the deed. The claim to commons was filed in pursuance to the provisions of the act of 2d of March, 1805. That act not only required that the nature but that the extent of the claim should be stated by the claimant, in his notice to be filed with the recorder. The demand was limited to six thousand arpens ; it was rejected by the board ; afterwards the congress of the United States, having in consideration this evi-

dence, and that which will be afterwards noticed, confirmed the claim.    The notice was, that " we, the inhabitants and settlers of Vide Poche, in the district of St. Louis, claim title to six thousand arpens of land situate adjoining said village, by virtue of concession made by lieutenant governor Don Zeno Trudeau, dated the 7th of December, 1796." The only evidence of the concession referred to in this notice, is contained in an answer endorsed by the lieutenant governor on a petition for a concession in his own behalf, or that of the inhabitants, by Gamache, in which it is stated, " that the demand cannot take place, nor any other concession be granted in the direction of a line taken from the end of the field lots of the village, and running parallel to the Mississippi further down said river, one hundred and fifty arpens.  St. Louis, December 7th, 1796." It was said that this concession, in terms, resembles that made to the inhabitants of St. Charles ; but they had metes and bounds to their commons—an actual inclosure.  It was not usual to make a formal concession of commons.  No concession was shown for the St. Louis commons, nor for the St. Charles commons, other than that alluded to, which is contained in an answer to an application for a concession, in which the applicant is told that the land asked for has been reserved for the use of the inhabitants.  It moreover appears, that the lines of the commons were extended from time to time, as the wants of the villagers demanded.  The lieutenant governor, not foreseeing the future cession of Louisiana, may have been unwilling to grant land in a particular direction, not knowing but that in the course of time it might be wanted, without intending to create any interest in inhabitants at the time of refusing a concession. Under this claim the inhabitants, as early as the 7th June, 1808, only demanded a confirmation for six thousand arpens. In the absence of a formal concession or survey, what better evidence of the quantity granted can exist than the quantity solicited.

The claim of Carondelet against the defendant can derive

no strength from the survey of Soulard on the 21st December, 1796. There is no principle by which the evidence of that survey can be affected by his certificate in February, 1806, used before the board of commissioners. It had no influence there, and can have no influence here. It is the unsworn declaration of a private man, and that, too, made use of as evidence, when, from aught that appears, he was present and might have been sworn. But the certificate itself, if designed for the purpose for which it is now used, is very unsatisfactory, not to say evasive. When was the deputy, Cousin, transported to Carondelet to make the survey? What portion of land was to be surveyed? Was the survey to be of land north or south of the Des Peres? Or was it to be a continuation of the survey begun in December, 1796? If the fact had been as contended, he must have known it, and it is surprising that he did not make a statement which would have put this matter at rest. But there is nothing in the certificate of the survey, made in 1796, which shows that the bank of the river was not the extremity of the line. If the survey was interrupted at the river by a temporary impediment, which, in all probability, would have ceased in a few days, if not in less time, why did the surveyor put a monument there, as though it had been a corner? Why place a stone and deposit flints and a bullet, when the survey was only interrupted by high water? The testimony of a witness can avail nothing against the certificate of the surveyor. But if the commons extended south of the Des Peres, if the lands south had been reserved, as was declared on the 7th December, it is a striking coincidence, that, on the day before, the lieutenant governor should have granted a concession on the south side to Delor De Treget to land which was declared the day before to have been reserved. The refusal of the concession to Gamache is consistent with the idea that the commons only extended to the Des Peres, as there is nothing in the petition which indicates that the land prayed for was south of that river; so far from it, the land asked for, if the

petition is understood, is north of the river. The certificate of the surveyor, viewed in connection with the alleged concession, presents so few points of correspondence with it, that it would be unsafe to rest a judgment on the ground that the answer to Gamache's petition was the document under which the survey was made. The only point of correspondence between the two is that of similarity of dates. While they resemble in this, they differ in the description of the lines. The one calls for a line parallel with the Mississippi; the other calls for a line parallel to those of Reihl and Alvarez. While the one designates the point of beginning, the other requires the lieutenant governor of the village to enjoin upon the inhabitants to make known the line of a tract of land which was conceded to them. While concessions usually direct the surveyor to put the party in possession of the land granted, neither of these documents has such a requirement.

How inconsistent is the conclusion of the certificate of the surveyor, with the pretence set up that the survey was incomplete, by reason of its being interrupted by high water. It bears date more than twelve months after the survey was made, and concludes thus : "In order that the inhabitants may prove the same, I have delivered these presents." Why make a delivery of that as evidence which was unfinished ? Why not state the fact in the certificate, if the survey was incomplete, and the reason why it was not afterwards finished ? Under the Spanish government, when the surveyor failed to comply with the order of the lieutenant governor to put a party in possession of the land conceded, he returned a reason for it. The return made to the order on the concession to Madame Lachaise, is an instance of this practice.

The release of Dunn to the inhabitants of Carondelet of his possession south of the Des Peres, dated 17th August, 1814, the testimony of Auguste Chouteau and Jean Bte. Provenchère, the prayer of Alvarez for a concession " departing from the limits of Carondelet ;" the request of Vallé for a grant " tak-

ing for limit that of the village of Carondelet," which grant, covered land south of the Des Peres, and the deed from Valle to Colgan, dated 6th February, 1804, for land bounded on one side by the common of Carondelet, and all the evidence of such nature, tended to the conclusion that there was a reputation of a common existing south of the Des Peres, and that timber and grass were used from that direction occasionally, just as from all vacant lands. As between the government and an individual, a recognition of right obtained under the influence of such testimony, would not be scrutinized. In a spirit of liberality to a people who had been transferred to our allegiance and made subject to our laws, without their consent, such things would pass ; there would be none to contest their validity. But different considerations arise, when such evidence is produced to divest others of their rights. The existence of a common, in any particular direction, does not negative the idea of private claims in their midst. The existence of such rights but little incommodes their enjoyment. Private claims did exist in the territory now claimed as commons by Carondelet, the titles to some of which are superior to that of the commons, and if, from neglect on the part of the claimants, or failure of the government to perform its duty, those titles have been lost or postponed to others, that does not prevent their former existence from being looked to, in considering the question of the extent of the common. If private claims to land existed in the midst of the commons, their subsequent extinction would not enure to their benefit. The titles to those claims being extinguished, they would become vacant lands, and nothing but some act of the law could convert them into commons. One of the private claims existing in the territory claimed as commons, is that of Julian Chouquette. This claim was confirmed by the board of commissioners, on the 25th of June, 1810. The claim not being founded on any concession by the Spanish government, it has been argued, that it furnishes no objection to the claim of Carondelet. That confirmation was made under the second sec-

tion of the act of congress, March 3d, 1807. Now it is impossible to read that section and not come to the conclusion, that the confirmation of that claim could only be founded on a state of facts entirely at war with the idea, that there was any rightful claim of commons to that land covered by the confirmation. Under that act, a claim could only be confirmed, when the claimant had been possessed for ten consecutive years prior to the 20th December, 1803, of lands not claimed by another. The grant of the commons was, as it is alleged, in 1796. Counting back ten years from 1803, would take us to 1793. Now the claim of Chouquette could only be confirmed upon evidence, that he was possessed on the 20th December, 1803, and for ten years prior to that day. The evidence of the claim as preserved in the minutes of the board, when considered with the strictness which characterized the scrutiny into the claims by the first board of commissioners, does not prevail against this argument. As the claim was confirmed, we must presume that the evidence warranted the act. There was another concession north of the Des Peres, which was confirmed under the act of 1812. The three other concessions, including Cerré's, south of the Des Peres, within the commons, were confirmed under the act of 1836. Although those claims might have been lost to the claimants, unless they became vacant lands prior to the 7th December, 1796, they would not enure to the benefit of the inhabitants of Carondelet, even admitting that they then became entitled to the boundaries they now claim. We do not consider the evidence in favor of the claim of Carondelet of such a character as would warrant the instruction given in this cause heretofore mentioned, nor to show an adverse right in the village against those defending under a concession by the Spanish government. The right to a confirmation may at one time have been lost, but when the confirmation is afterwards made, it attaches to the land originally conceded, unless it has been previously disposed of by the government. In the absence of a survey, showing that the land

Inhabitants of Carondelet *v.* Dent.

had been conveyed to Carondelet previous to the confirmation in 1836, we cannot sanction the instruction that was given by the court. The defendant's title may exist without affecting the confirmation to Carondelet. The quantity claimed by the village may be obtained without including the land of the defendant, consistently with the evidence she produced, in order to effect a confirmation of her claim. The defendant's concession was older than that of Carondelet; there was a possession under it, and that possession has been continuous, so that an action against him is necessary. Carondelet has no cause to complain of this view of the subject. The same justice has been meted to her that was meted to her sister villages, St. Louis and St. Charles. St. Louis claimed 4,293 arpens for commons; her claim was confirmed. St. Charles claimed 14000 arpens; the quantity demanded was granted to her. Carondelet claimed 6000 arpens; her claim was conceded to her, although her claim was made under circumstances far less favorable than those attending the other claims. She is entitled to that quantity at any rate, but such is the evidence of her claim, that she is not authorized to disturb the titles of others to obtain it. She may be entitled to more as against any one but the government, and as against the government itself, if the survey has been approved. Had there been a binding survey of the commons prior to the 4th of July, 1836, this case would have fallen within the principles involved in the cases of the St. Louis and St. Charles commons. As to the effect of an approval of the survey subsequent to that event, we will not express an opinion, not meaning hereby to intimate an opinion that a subsequent approval would vary in effect from one made prior to 4th July, 1836. Judge Ryland concurring, the judgment is reversed. Judge Gamble not sitting in the case.