### IN

# THE SUPREME COURT

### OF

## THE STATE OF MISSOURI,

### MARCH TERM, 1860, AT ST. LOUIS.

---

DENT, Plaintiff in Error, v. SIGERSON *et al.*, Defendants in Error. *

1. Under the practical construction given to the laws of the United States previous to 1836, United States surveys, when made and approved by the surveyors general, stood as the authorized governmental surveys until they were set aside by some authority having a right of supervision over the official action of the surveyors general; it was not necessary, in order that a United States survey duly made and approved by the surveyor general should become an authoritative survey, that it should be transmitted to the General Land Office, and receive the formal approval of the commissioner, or of the department to which he was subordinate.

2. Confirmations under the act of Congress of July 4, 1836, do not relate back to the date of the original Spanish grant or concession so as to exclude intermediate grants; they take effect only from the date of the passage of said act.

---

* This and the two following cases were decided at the March term, 1859, of the supreme court. They were held back from publication in order that the dissenting opinion of Judge Scott might accompany the report. This dissenting opinion was filed at the March term, 1860.—[REP.

3. The United States survey of the common of Carondelet made by Joseph C. Brown, deputy surveyor, stood as an approved and authoritative survey of the United States in the year 1834; and whether it did or did not relate back to the inception of the title to common under the act of Congress of June 13, 1812, still the title of Carondelet to the land embraced within said survey as common is superior to and must prevail over a title emanating from the United States by virtue of a confirmation under the act of Congress of July 4, 1836.

*Error to St. Louis Circuit Court.*

The facts in evidence are sufficiently set forth in the opinion of the court. The following instructions asked by the plaintiff were refused :

1. If the jury believe from the evidence that there was no grant, concession or survey of any land south of the river Des Peres as commons for the village of Carondelet, nor any use of land there for that purpose, under and by the authority of the Spanish government, then the act of Congress of June 13, 1812, and of 1831, did not confirm any land there as commons.

2. The reply of Zenon Trudeau to the petition of Gamache dated December 7, 1796, given in evidence by plaintiff, is no grant or concession of any land to the inhabitants or village of Carondelet for commons.

3. The jury are instructed that there is no evidence of any use of any land south of the river Des Peres as commons, under and by authority of the Spanish government, by the inhabitants of Carondelet prior to December 20, 1803.

4. No grant, concession or order of survey of any land south of the river Des Peres as commons for the village of Carondelet having been shown, nor any use of land there as commons, and the survey of the United States of said commons not having been finally approved by the United States until the 23d day of February, 1855, the jury are instructed that the confirmation of the claim of Gabriel Cerré by act of 4th of July, 1836, and surveyed by the United States as United States survey No. 3067, is a better title to the land within the limits of that survey than any derived from Carondelet.

5. If the jury find from the evidence that Gabriel Cerré, or those claiming under him, inhabited, cultivated or possessed a tract of land of ten by forty arpens conceded to said Cerré on the 15th of March, 1789, or some portion thereof claiming the whole, in the year 1796 and prior to the 20th of December, 1803, and that the same land was confirmed by act of Congress of the 4th day of July, 1836, and surveyed by the United States as survey 3067, then the said confirmation and survey are a better title to the land within the limits of said survey than any derived from Carondelet shown in this case.

6. The jury are instructed that as no grant, concession or survey under the Spanish government for any lands as commons for the village of Carondelet south of the river Des Peres has been shown, and as the survey of the commons of Carondelet was not finally approved by the United States until the 23d day of February, 1855, the claim of Gabriel Cerré, confirmed by the act of Congress of 4th July, 1836, and surveyed by the United States as survey No. 3067, is a better title to land within the said Cerré survey than any derived from Carondelet, unless the jury should find that the land within the limits of said Cerré survey was used as commons by the inhabitants of Carondelet prior to the change of government.

7. The jury are instructed that the confirmation to Gabriel Cerré by act of July 4, 1836, and the survey thereof by the United States as survey No. 3067, conveys a better title to the land within the limits of that survey than any derived from Carondelet, unless the jury should be satisfied from the evidence that the inhabitants of said town used the land within the limits of said survey prior to the change of government as commons of said town and subsequent to the date of said concession to Cerré.

8. The survey given in this case, the certificate of which bears date the 8th of October, 1855, is the only valid and subsisting survey of the commons of Carondelet, and by the terms of the approval of said survey it can have no force or

effect against the rights of those deriving title under the confirmation to Gabriel Cerré by the act of Congress of 4th July, 1836, and survey of the United States No. 3067 of said Cerré's confirmation; and, as the claim of the inhabitants of the town of Carondelet as filed before the recorder of land titles and exhibited before the board of commissioners was for six thousand arpens in quantity and not by extent or boundary, if the jury find from the evidence that said concession in evidence was granted on the 15th day of March, 1789, by Lieut. Governor Perez, and that the land embraced therein was inhabited, cultivated and possessed in the year 1796, and afterwards prior to the 20th day of December, 1803, (or some part thereof claiming the whole,) by Gabriel Cerré or those claiming under him, and that said land was confirmed to said Cerré or his legal representatives by act of 4th July, 1836, and surveyed by the United States as survey No. 3067, then the jury are not authorized to find that said land is any portion of the land confirmed to the inhabitants of Carondelet as commons.

9. The surveys of the Carondelet commons as made by Rector and Brown were disapproved by the commissioner of the General Land Office and by the proper authorities of the government of the United States; and if the jury find from the evidence that the final approval of the said surveys of Brown and Rector, by the Secretary of the Interior in 1855, excluded from said surveys 1702.04 acres of land reserved for the use of the military post at Jefferson Barracks—and further provided that the parties claiming adversely to Carondelet should not be hindered, by reason of said survey, or the approval thereof, from establishing and settling their right before the judicial tribunal of the country—and that the survey made under the said final approval of said surveys expressly declared that, as regards the rights of all other claimants within the limits of said survey of the commons aforesaid, who hold adversely to Carondelet, should not be construed to interfere with the rights of such adverse claimants to seek a judicial settlement of their several interests—

and if the jury further find that plaintiff was an adverse claimant to Carondelet of the premises in question under the grant to Gabriel Cerré—and that said grant was confirmed to the said Gabriel Cerré and his legal representatives by the act of July 4, 1836—and that a survey thereof was made by the United States embracing the premises in question in the year 1838 and duly approved—and that said Cerré possessed, inhabited or cultivated the said tract of land, or any part thereof claiming the whole, prior to the 20th day of December, 1803—then the surveys of Rector and of Brown of the land claimed as commons for Carondelet south of the river Des Peres are not, nor are either of them, conclusive against the plaintiff; and unless the jury find from the evidence that the inhabitants of Carondelet used or possessed the premises in question prior to the 20th of December, 1803, as commons belonging or appertaining to said village of Carondelet, the plaintiff is entitled to recover in this action.

10. The survey of the Carondelet commons made under the final decision of the Secretary of the Interior of 1855 is not conclusive against the claim of the plaintiff under the confirmation of 1836 and the survey of 1838 ; and if the jury find from the evidence that plaintiff was an adverse claimant against Carondelet of the premises in question, under the grant to Gabriel Cerré, and that said Cerré inhabited, cultivated or possessed the said tract of land, or any part thereof claiming the whole, prior to the 20th day of December, 1803, then the plaintiff is entitled to recover, unless the jury further find from the evidence that the inhabitants of Carondelet used or possessed the premises in question prior to the 20th day of December, 1803, as commons belonging to or appertaining to said village of Carondelet.

11. If the land in the possession of defendant at the commencement of this suit was part of a tract of land conceded to Gabriel Cerré on the 15th day of March, 1789, by Lieut. Governor Perez, and that claim to said tract was confirmed to Gabriel Cerré or his legal representatives by act of Congress of July 4, 1836, then the title under said confirmation

32—VOL. XXIX.

is a superior title to the land thus confirmed to any derived under the inhabitants of Carondelet, unless the jury should find that said tract became vacant land prior to December 7, 1796.

12. If the jury find from the evidence that the premises in question, or any part thereof under claim for the whole tract, was inhabited, cultivated or possessed prior to the 20th day of December, 1803, by Gabriel Cerré, under the grant to him of 1789, or otherwise, then the inhabitants of Carondelet did not become vested with any title to the same land as commons belonging to said village, unless prior or subsequent to said inhabitation, cultivation or possession of Cerré, they used or possessed the same premises as commons belonging to or appertaining to said village prior to the 20th day of December, 1803.

13. The certificate of Soulard dated in 1806, read by defendant from transcript of the claim of Carondelet as presented before the board of commissioners, is no evidence of the facts as therein stated.

14. The testimony of witnesses for defendant as to declarations of deceased persons relative to the extent of the claim of commons and use of the land for the same is no evidence of title in this case, nor that the land was passed by the confirmation of the act of 13th June, 1812, nor any evidence of an inchoate title such as was confirmed by the act of 1812.

15. The confirmation of the claim of the inhabitants of Carondelet to commons, as presented to the board of commissioners, is not more *extensive* than the claim ; and if the claim to the six hundred arpens as asserted before the board of commissioners can be satisfied without interfering with the land claimed before the board by Gabriel Cerré, and afterwards confirmed by act of Congress of July 4, 1836, then the plaintiff is entitled to recover for such land as he may have proved the defendants to have been in possession of at the date of this suit within the limits of the United States survey of said confirmation given in evidence by plaintiff.

16. Actual, open, notorious, adverse possession of a tract

of land, or parcel of the same, for twenty consecutive years, claiming to own the same, vests an absolute title in such possessor to the land so possessed. If the jury find from the evidence that the plaintiff has had such possession of the premises sued for, for twenty consecutive years ending at any time within twenty years before the commencement of this suit, they will find for the plaintiff.

17. If the jury find from the evidence that the plaintiff entered into a part of the tract of land of four hundred arpens known as the Cerré tract under a claim of title thereto by a recorded deed from Gallatin to him, his entry and possession are referred to such title, and he is deemed to have a seizin of the land coextensive with the boundaries stated in the said deed, unless there is an open, adverse possession of some part of said land so described in some other person. Therefore, if the jury find from the evidence that the plaintiff entered into said premises after the execution of said deed, and actually occupied a part thereof, in person or by his tenants, claiming to own the same, for twenty consecutive years, claiming the whole of said tract, and that such possession was open, notorious and adverse to all persons, then the jury will find for the plaintiff.

The defendant asked the court to give the jury the following instructions: "1. The inhabitants of Carondelet were confirmed in their claim to commons by the act of Congress of 1812 and 1831. 2. The notice of claim of said inhabitants, as filed with the recorder of land titles and exhibited before the board of commissioners, is evidence of the extent of the said claim to commons. 3. If the claim of the plaintiff is included within the boundary of the lands confirmed to the town of Carondelet by the acts of 1812 and 1831, then the jury must find for the defendants, because those acts passed the title to the land in controversy to the inhabitants of said town. 4. The said acts of 1812 and 1831, and the survey of the commons of Carondelet exhibited here to the jury, are equivalent to a patent for the lands included within such survey. 5. The survey of the commons of Ca-

rondelet made in 1817 by Rector is a legal and valid survey of the said commons. 6. The resurvey of the said commons as made by Joseph C. Brown retracing Rector's lines, and approved by Elias T. Langham, surveyor general for Missouri, was a legal and valid survey, and located the land confirmed by the acts of 1812 and 1831 to the inhabitants of Carondelet. 7. The survey of the commons of Carondelet having stood legally approved at the passage of the act of July 4, 1836, the plaintiff took no title to any land by virtue of his confirmation, but had merely a right to locate the same quantity of land upon the public domain. 8. The documents read in evidence by the defendant are evidence to show the extent and location of the claim of Carondelet to commons at the dates of said documents respectively. 9. If under the Spanish government and down to June 13, 1812, the inhabitants of Carondelet had used and claimed the land since surveyed as commons, such user and claim is evidence of the extent of the claim as confirmed." The court refused to give these instructions.

The court, on its own motion, then gave the following instruction: "If the land in controversy is within the survey of the commons of Carondelet made by Rector in 1817 and that made by Brown in 1834, the plaintiff is not entitled to recover in this action." This was the only instruction given — all instructions offered on either side being refused.

The jury found for defendant.

*H. R. Gamble, Shepley*, and *B. A. Hill*, for plaintiff in error. Mr. Shepley, in a written brief, presented the following points:

1. As to those portions of the common of Carondelet not included within the Barracks reservation and the confirmations and surveys under the act of July 4, 1836, I admit the title of Carondelet is perfect, and the United States and Carondelet are both estopped to deny that, excluding those portions, the survey is conclusive of the boundary and extent of the commons. The question is, what is the condition of

those portions confirmed by the act of 1836, and surveyed shortly afterwards, and incidently of the Barracks tract? Carondelet released only a portion of the 1702 acres reserved, and which is expressly excluded by the Secretary of the Interior in 1855. Up to the approval of Brown's survey, October 8, 1855, there was no valid approved survey of the commons of Carondelet; as far as the land in controversy is concerned, Carondelet is in no better situation now. The land was already confirmed and surveyed to us. The question whether a survey is approved and when and how, and whether at any time it is a valid and subsisting survey, is a question of law to be determined by the court.

II. The evidence conclusively showed that the field notes made by Rector in 1817 were not a survey of any confirmation of commons. There was no authority at that time to make any such survey; no instructions ever issued. It was a loose scrap of paper not signed by any one. It was never paid for. It was imperfect; it never could have been examined and approved. There was no plat accompanying the field notes, and no plat ever made in the surveyor general's office. It was made to subserve a private purpose. It has never been set up as a valid survey until the question arose as to whether the action of the government in disapproving Brown's survey was done in a reasonable time. It differs in many particulars from Brown's survey, and Brown's is the only survey that is or ever was recognized as a subsisting survey. It never was sent to the commissioner of the General Land Office, and never referred to in the correspondence between the surveyor general and that office. Part of it was sectionized.

III. The surveys made and returned to the office of the surveyor general are subject to the supervision and amendment of his superior at the seat of government. (1 Land Laws, p. 11, 50, 70, 96, 104, 132, 189, 211, 278; Act of July 4, 1836; Menard v. Massey, 8 How. 294; Guitard v. Stoddard, 16 How. 512.)

IV. That control was exercised. Brown's survey was dis-

approved of by the department at Washington in 1853; and as Brown's survey never has been approved, it was exercised in a reasonable time, within a few months after the plat was returned to the Land Office. From 1839 there has been a steady resistance on the part of the department against allowing that survey to stand in its integrity. In 1853 it stood as a rejected survey by the tribunal of last resort.

V. The present approved survey of Carondelet is not an approved survey so far as the Jefferson Barracks tract and the interferences with confirmations are concerned. It includes within its lines the Barracks tract and the confirmed claims. A controversy is still going on and unsettled as to a portion of the reservation of the Barracks tract. The conveyance made by Carondelet omitted a considerable part of the tract. The effect of the present survey, as it stands approved, is precisely as if the Secretary of the Interior had directed the surveyor general to run the lines so as to leave out the Jefferson Barracks tract and the confirmations. That evidently was the intention in effect; but as, in practice, it could not be effected, owing to some of the confirmations being in the midst of the tract which the United States were willing to give to Carondelet, the only thing that could be done, and give to Carondelet the title to that about which there was no interference, was to make it general and except out certain tracts from its effect.

VI. Even if the legal effect of the approval be to set up Brown's survey as the survey of the Carondelet common without exception or exclusion of any tract within its limits, yet it is an approved survey only from the 8th of October, 1855; and as the United States had previously confirmed and surveyed the Cerré claim, that is the superior title.

VII. The evidence of the old witnesses as to what they had heard as to the extent of commons of Carondelet was not competent testimony. So the instruction in relation to the effect of cultivation and possession by Cerré prior to December 20, 1803, ought to have been given. There is no

proof, and scarcely any pretence of proof, of any grant or survey or even recognition of commons south of the river Des Peres under the former government.

*B. A. Hill* also presented and discussed the following points in behalf of plaintiff in error :

I. The title of Carondelet is claimed under the act of 1812, and there being no evidence of any user or grant south of the river Des Peres, the only claim of Carondelet to this land arises under a survey of 1834 by Brown, deputy surveyor of the United States.

II. This survey was not approved by the surveyor general until 1839, and it was disapproved the same year by the commissioner of the General Land Office ; and upon appeal, it it was again disapproved in 1853 by the Secretary of the Interior.

III. The survey had no further force or effect after this disapproval, and the land confirmed to Cerré in 1836 and surveyed for him in 1841 was appropriated by force of the act of Congress of 4th July, 1836, for the benefit of Cerré's legal representatives.

IV. The subsequent approval of the survey of the commons by McClelland in 1855 is not an approval of Brown's survey of 1834, but excepts several thousand acres of land from it. It does not relate back to the survey of 1834, for it is not the same survey, and the Secretary of the Interior had no power to reverse the decision of his predecessor made in 1853. The reversal of Stuart's decision of 1853 and the attempted restoration of Brown's survey by McClelland in 1855 was fraudulent and void.

V. The effect of a survey works by estoppel. The United States was not bound by this survey in 1841, when Cerré's confirmation was surveyed, and the claims of the parties must be determined according to the relative merits of their Spanish titles. If the United States had not located this land under the laws of the United States, then it was subject to location under Cerré's confirmation ; and having been

located, the defendants have no title, and plaintiffs should recover.

V. The Spanish title of Cerré is clearly superior to the commons' title, and can only be defeated by a prior location for the commons by the United States. There has been no such prior location.

*Whittelsey*, for defendants in error.

I. The survey of the commons of Carondelet made by Rector was a legal and valid survey binding upon the United States and those claiming under them by subsequent grant. It was made by authority of law. (1 Land Laws, 50, 70, 90, 104, 112, 115, 119, 121, 122, 128, 132, 138, 153, 166, 176, 180, 189, 211, 216, 230, 242, 255, 278, 280, 385, 397, 552; 8 How. 301, 317; 17 How. 415; 4 How. 456; 18 Howard, 473, 43; 19 How. 79; 9 How. 333.)

II. Waiving the effect of Rector's survey of 1817, the survey of Joseph C. Brown (retracing Rector's lines) was officially approved July 29, 1834, by surveyor general Langham, and was therefore a valid and binding survey. This stood undisputed until 1839, when the War Department began to oppose it on account of the reservation for Jefferson Barracks being included in the survey. (4 How. 169; 9 How. 333; 18 Mo. 43; 19 Mo. 334, 342, 79; 8 How. 317, 301, 313.) Prior to July 4, 1836, the department at Washington had no authority to supervise the action of the surveyor general in the survey of private claims. (1 Land Laws, 552, 278; 9 How. 333; 18 How. 43; 9 Mo. 323, 804.)

III. The act of Congress of Jan. 27, 1831, supplemental to act of June 13, 1812, relinquishing to the inhabitants of the villages named, was of itself, as against the plaintiff's claim under the act of 1836, a confirmation by metes and bounds, as the commons were then surveyed. (6 Rob. La. 139; 4 How. 456.)

IV. The documents offered in evidence by defendant were evidence that a grant of commons had been made to Carondelet. The reputation among old witnesses, deceased, as to

Dent v. Sigerson.

the extent of commons under the Spanish government, and especially as to its use in the olden time, was good evidence. (1 Greenl, Ev. 166, 168, 139, 175, 145 ; 1 M. & S. 97 ; 1 Stark. Eq. 29 ; 5 Cow. 315 ; 2 Ad. & El. 171.) The plaintiff can not claim title by virtue of the statute of limitations as prayed in the sixteenth and seventeenth instructions. (Reilly v. Chouquette, 18 Mo. 221.) He can not claim title under the first section of the act of June 13, 1812. The land sued for was not an out-lot, common field lot or village lot. Cerré was not an inhabitant of Carondelet.

· V. The approval of Brown's survey by the Secretary of the Interior in 1855 had the effect not to make said survey valid as from the date of his approval, but to declare that it was a valid survey when approved by Langham July 29, 1834, and that full force and credit should be given to it as such ; and also to declare that the survey of Rector was a valid and subsisting survey as approved in 1817. Admitting that the approval of the Secretary of 1855 gave effect to the survey as of a new survey of that date, the case will not be altered ; for the defendants have the elder title, and the survey is not the grant of title, but simply the evidence of location or description of the land granted, and of course relates back to the date of the confirming act. (4 How. 456 ; 10 How. 348 ; 14 How. 513 ; 19 How. 79 ; 10 How. 348.) The defendants have title by act of June 13, 1812.

NAPTON, Judge, delivered the opinion of the court.

The controversy we are called upon to determine in this case is one of long standing, and involves facts and legal principles concerning which there has been for many years much variety of opinion, both in the department of the federal government and the judicial tribunals, whose action upon it has been invoked.

The conflicting titles in the case are that of the inhabitants of Carondelet to commons, and a claim of Gabriel Cerré lying within its supposed limits. The title of Carondelet to her

commons originated in 1812; that of Cerré took its origin, for all purposes now material to be regarded, from an act of Congress passed in 1836. A survey, purporting to be a designation of the Carondelet common, was made anterior to 1817, and subsequently retraced in 1834. That of Cerré's confirmation was made in 1837.

It is manifest that the title of Carondelet is the better title, unless its locality, as fixed by the two surveys alluded to, can be disturbed. The whole controversy, therefore, turns upon the surveys.

On the part of the claimants under Cerré, it is insisted that Rector's survey, which was made previous to 1817, was unauthorized by law, or by the orders of his principal; that it was a private and unofficial survey and was never approved; and that Brown's survey in 1834, which purported to be a resurvey of Rector's, was disapproved and set aside by the executive department of the government which had the supervision of this branch of the public service; and that its ultimate approval in 1855 was conditional and qualified, and gave the title based on it no efficacy in opposition to that of Cerré. If these propositions can be maintained, it must follow that the claimant under Carondelet is not entitled to recover.

We do not think it necessary to determine, in this case, whether the commissioner of the General Land Office, prior to the act of July 4, 1836, could legally exercise any supervision or control over the surveys executed and approved by the surveyor general of Illinois and Missouri. Such a power may be very proper, perhaps necessary, to the performance of the duties confided to that bureau by the act of Congress which established it in 1812. Although no express provision has been found giving the land office or its commissioner such control, it may be a necessary implication from powers which were expressly given. As the conclusion we have reached is not inconsistent with the concession of such a controlling and revising power in the commissioner, we have not deemed it necessary to examine the subject more

particularly.   No such power was attempted to be exercised in reference to Rector's survey.   There is reason to believe that it never was contemplated by any of the acts of Congress concerning the public surveys, nor by any practical construction of them either here or in the department at Washington, that a survey, duly and legally made and approved by the surveyor general here, of a private claim had, as a matter of course, to be transmitted to the general land office, and receive the formal approval of the commissioner, and of the department to which he was subordinate, before it could be regarded as an authoritative survey.   On the contrary, under the practical construction of the laws previous to 1836, both here and at Washington, the survey, when made and approved by the surveyor general, stood as the authorized governmental survey until it was set aside by some authority having a supervision over the surveyor's office.   As Rector's survey was never attempted to be disturbed by any one, or at any time, so far as this record shows, until it became merged in Brown's in 1834, and was recorded in the office as the government survey, it can be nowise important to inquire whether it could have been set aside, if proper steps had been taken for that purpose.   We speak of it now as a survey *de facto*, as practicably approved and acted on.   Whether it was legally null for want of authority in the officer to make it is another question, which we proceed to consider.

The act of April 29, 1816, (1 Land Laws, 278) expressly made it the duty of the surveyor " to cause to be surveyed the lands in the said territories, [Illinois and Missouri,] the claims to which have been or hereafter may be confirmed by any act of Congress, which have not already been surveyed according to law."   Rector's survey, it appears, was in the office of the surveyor general at St. Louis in 1817.   Whether made prior or subsequent to the passage of this act does not appear.   In our view, it is immaterial; for as the act of 1816 required the survey to be made, even if no law previous to that did, it was not necessary for the surveyor to cause a new

survey where one already existed which met his approval. In the absence of proof to the contrary, the presumption is that the officer has done his duty ; and if no survey was authorized before the act of 1816, we would presume that a survey found in the office in 1817, and recognized there as an official act, was made at a time when the law permitted it. Rector's survey can not then be regarded as a mere private and unauthorized survey. It appears that the surveyor general, under whose administration it was made, approved it in the only mode then customary in his office, and that it was treated as an official survey by those who at that time and subsequently had control of this office. The presumption is that it was made in conformity to directions and instructions from the officer who sanctioned it when it was reported to him.

No particular importance is attached to Rector's survey, so far as the decision of this case is concerned, except as it constitutes the basis of Brown's survey in 1834. This last survey was unquestionably authorized by law, and made under instructions issued by the proper authority. Brown was directed to retrace Rector's lines, and to connect them with the public surveys. It can be of no consequence to inquire whether Brown's survey, made under these instructions, did in all respects conform to them, for, besides that the surveyor general and all the departments having control over the subject did not complain of the correctness of Brown's survey in this respect, it is evident that so far as the Cerré claim is concerned, it is immaterial which survey is regarded as the true one, as either will undoubtedly embrace the confirmation.

For five years this survey remained in the office at St. Louis as the approved survey of the Carondelet commons, and regarding Brown's survey as a mere resurvey of Rector's, it had stood as the approved governmental survey for twenty-two years before any effort whatever, on the part of individual claimants or government officers, was made to disturb it.

In 1839, after this survey had thus been recognized for nearly a quarter of a century by the surveying department, and had been apparently acquiesced in by those supervising tribunals who possessed the power, if they had thought proper to exercise it, to set it aside, it seems that the War Department became alarmed about their title to a military post which had been established at Jefferson Barracks within the limits of this survey, or at all events thought it expedient to appropriate a considerable tract of land, including that post, for the convenience of the government, and entertained apprehensions that the title of the inhabitants of Carondelet might prove an obstacle to this appropriation. At what time, or by what authority, this post was first established there is not shown by any document in the record; nor is it material, for it will be seen in the sequel that the government succeeded not only in securing their title to the enclosures around the post, but to 1702 acres of land which were laid out and surveyed around it. The title to this tract cuts no figure in this case; it is merely alluded to as showing the origin of the inquiry, which, in 1839 or 1840, was instituted into the legality and propriety of the two surveys of Rector and Brown. The attention of the Land Office was in this way directed to the subject, and the district attorney for Missouri, and the Solicitor of the Treasury, and the commissioner of the General Land Office, all concurred, on the first suggestion of the matter, that "Brown's survey embraced several thousand acres of land to which Carondelet had no legal or equitable title." This sentence was a summary one; but it was never executed. From this period, for a succession of years, a discussion was carried on between the department at Washington and the surveyor general here, which it is unnecessary particularly to notice. For a short period the inclination of the Land Department seemed to be adverse to the Carondelet title and to the survey which the government had furnished as evidence of its locality. The government secured her tract of 1702 acres for the Barracks, and a portion of the land south of the Des Peres

was actually entered or preëmpted at the land offices of the district although against the express orders of the department at Washington.

An examination of this correspondence will show that all the surveyors general, from the date of Rector's survey until the conclusion of the dispute, including Wm. Rector, Lang- ham, McCree, Dunklin, Spalding, and Milburn, uniformly maintained the integrity of Brown's survey, and pronounced it official and binding.  The recorder of land titles concur- red in this view when officially called upon for his action; nor did the heads of departments and bureaus at Washing- ton concur in a different view.  On the contrary, with the exception of the officers who first took up the subject in 1839 or 1840, and the Secretary of the Interior in 1853, they also regarded these surveys as authoritative, and declined to dis- turb them.

It is not deemed important to refer particularly to this official correspondence, except so far as it may be necessary to ascertain what has been the action of the government in relation to these surveys.

In 1841, the solicitor of the treasury (McRoberts) makes a communication on this subject to the Land Office, review- ing and examining the title of Carondelet, and after pro- nouncing an unfavorable opinion of its merits and recom- mending 1702 acres to be surveyed and reserved for military purposes, and after designating a specific extent of the sur- vey which he supposed sufficient to satisfy the claim of Carondelet, which he regarded as limited by the quantity originally claimed before the old board of commissioners, he advises a subdivision of the remaining part of the tract with a view to its sale at auction as public land.  In this report and recommendation the commissioner (Whitcomb) concur- red.  The Barracks tract was accordingly surveyed; portions of the remainder were ordered to be subdivided and sold; and, subsequently, but after this order was countermanded, some of the land was permitted to be entered at the Land Office; but in September, 1845, the then commissioner

(Shields) came to the conclusion that it was inexpedient to direct the survey of these lands included within the survey of the Carondelet common. In November, 1846, the same officer, in an official communication, says: "I deem it inexpedient to interfere in any manner with the survey of that common (Carondelet) as originally made by Elias Rector prior to 1817, and retraced by Joseph C. Brown, deputy surveyor, in March, 1834, more especially as the surveyor general, in a certificate to a plat of this common dated April 15th, 1840, has reported to this office that under an act of the legislature of the state of Missouri, passed in pursuance of the act of Congress approved January 27, 1831, the corporate authorities of the town of Carondelet laid off into small tracts the land within Brown's survey of the Carondelet commons, except a portion around Jefferson Barracks, and disposed of the same, or the greater part thereof, to private individuals." The commissioner concludes his communication by saying: "I would recommend, in view of all the facts, that the claim of the town of Carondelet to the whole common as surveyed by Joseph C. Brown in 1834 be confirmed, reserving as much as may be necessary and proper for the United States post at Jefferson Barracks and all valid interferences."

In 1848 another commissioner (Young) declared, substantially as Gen. Shields had done, that "it would be inexpedient to interfere in any manner with that survey."

In 1852, the commissioner (Butterfield) makes a careful examination of the subject, and his conclusion is as follows: "On a full examination of this matter, I find that the proceedings of solicitor Burchard and commissioner Whitcomb were received in September, 1845, by commissioner Shields, who, by letter of the first of that month to the surveyor general, stated that he had refused an application for the survey of a part of the Carondelet commons directed in 1841; and, in a letter of February 14, 1846, to the Hon. J. W. Tibbatts, stated that he deemed it inexpedient to interfere in any manner with the survey of that common as originally made by

LAW SCHOOL LIBRARY.

Elias Rector prior to 1817, and retraced by Joseph C. Brown in 1834; that the lands within Rector and Brown's surveys are not subject to preëmption or ordinary entries, &c., &c. This course was adhered to by acting commissioner Piper and commissioner Young, and has not since been departed from. As the decision of the solicitors and the instructions of commissioner Whitcomb *were not executed, I regard them as overruled* by the subsequent action of commissioners Shields, Piper and Young, and by the action of the three last named of my predecessors. *It has been settled that this office must not disturb or in any manner interfere with the aforesaid survey by Brown,* unless Congress shall otherwise order by further legislation; but that said survey is *subject to such adverse valid rights* as may exist under confirmed private claims, and also to the right of the United States to the military reservation," &c. "I therefore regard this office, under existing laws, as having no further power or control over the subject."

In the same year (1852) the commissioner of the General Land Office (Wilson) examines the subject somewhat at large; considers both surveys official and valid, and declares " that the United States, by these proceedings, have parted with the fee in the land, and any question of conflicting interest in them is, in my opinion, purely a judicial one, and in which the executive can now properly exercise no control."

In 1853, the Secretary of the Interior disregarding these opinions, directed a new survey; but, before any definite action was had, his successor finally in 1855 settled the question in favor of noninterference. After reciting the history of the official proceedings relative to these surveys, and the acts of Congress and decisions of the supreme court supposed to bear upon the subject, the Secretary says: " In view, therefore, of all the facts and circumstances in this case, and of the opinions expressed by the highest tribunal known to our laws, I am compelled to the conclusion that, as *the surveys of* 1816 *and* 1834 *were executed by competent*

*authority, were duly approved,* and were for a series of years acquiesced in by the inhabitants of Carondelet, both the government of the United States and the inhabitants of Carondelet were estopped and concluded thereby. My decision therefore is, that the survey of 1816 or 1817, as retraced by Joseph C. Brown in 1834, should be sustained, excluding, of couse, the 1702 acres heretofore set apart and reserved for the use of the military post at Jefferson Barracks; and that the parties claiming adversely to Carondelet should not be hindered thereby from establishing and settling their rights before the 'judicial tribunals of the country."

Thus, it will be perceived that the department at Washington in 1855 returned to the point from which they had started in 1839, except so far as the military reservation was concerned, and to secure which had been from the beginning the principal cause of anxiety. Rector and Brown's surveys were declared to have been executed by competent authority, to have been duly approved, and to have been acquiesced in by both the government and Carondelet for a series of years sufficient to conclude them both; conflicting claims were left to the decision of the courts.

In the discussion of this case it was urged, on behalf of those who claim under the Cerré confirmation, that this decision of secretary McClelland is not an approval of Brown's survey in its original entirety; that it distinctly and expressly excludes the tract of 1702 acres retained as a military reserve, and that it also, in the same manner and to the same effect, excludes the private claims; that this survey is therefore no evidence against those who claim under the confirmations of 1836.

We do not concur in this interpretation of the secretary's language and meaning. It is true that great care is manifested in particularly excluding the military reserve of 1702 acres from the survey. The validity of such an exclusion is not a matter which is a subject of inquiry here; and it appears from the official correspondence in the record that Carondelet had conveyed all her title to this reservation, if

she had any, to the government. But the language employed
by the secretary in relation to private claimants is totally
different from that used in relation to the military reserva-
tion. He sustains the survey, " excluding, of course, the
1702 acres," &c. ; but he does not exclude any other tract
from the survey. He expresses the opinion that " the par-
ties claiming adversely to Carondelet should not be hindered
thereby from establishing and settling their rights before the
judicial tribunals." Had the secretary entertained a design
of excluding any private claim from the survey he would
surely have specified it as he did the tract of 1702 acres, or
so described it, or the class to which it belonged, as to have
made its ascertainment easy. No private claim is referred
to by the number of the survey, or the name of the claim-
ant, or the character of the claim. The terms employed in
speaking of adverse claims are broad enough to include, not
only those of Spanish origin already located by survey, but
such as never had been surveyed. They would also embrace
pretensions originating under the present government, and
might be construed to include mere trespassers. A posses-
sion, with a claim of title, makes a party as much an adverse
claimant, and sometimes quite as formidable a one, as an
inchoate title under the Spanish government. We can find
no line of discrimination at which this asserted exclusion is
to cease ; and according to this construction of the secreta-
ry's decision, the survey could be of little, if any, use to
Carondelet, seeing that whenever a controversy exists it can
be of no avail, and when there is no controversy she can do
very well without it.

It was not the intention of the executive, as we think, to
give any such approval, or rather disapproval, of Brown's
survey as has been contended for. The exception or reser-
vation of the rights of private claimants was merely an ex-
pression of opinion, similar to those previously expressed by
the heads of the land department, that the survey was " sub-
ject to such adverse valid rights as may exist under confirmed
private claims," and that " any question of conflicting inter-

est in them was purely a judicial one, in which the executive could properly exercise no control."

Regarding this decision in 1855 as settling the action of the government in relation to the validity of Brown's survey, it remains to be considered at what date the survey is to be held as a designation of the land by the government. It will be understood, from what has been already said, that we do not consider the determination or decision of the department in 1855 in the character of an original approval of a survey. It is rather viewed simply as a final conclusion on the part of the executive of the United States, through the proper department, that the survey should not be disturbed; that its previous approval by the surveyor general, under whose directions it was made, and by his successors, and by former commissioners of the Land Office, should stand. Conceding the right of the commissioner of the Land Office, even prior to 1836, to revise the surveys approved by the surveyor general, we do not understand, as before observed, that the acts of Congress on this subject, either in their letter or spirit, or in the practical construction they have received, require a survey to be regarded as incomplete until it receives the final and formal approval of the commissioner and the department of the Interior to which he is attached. Many of the private surveys, particularly those made under the act of 1815 concerning New Madrid certificates, reached the Land Office only through the medium of the recorder of land titles; and the laws have not made it a prerequisite to their validity that they receive the formal sanction of all the bureaus and departments through which they may, if contested, have to pass. Such a construction of the law would lead to great embarrassment in the land titles depending to some extent upon these surveys. Great inconvenience and practical injustice, we apprehend, might result from holding that a survey, which has stood for years as the authoritative governmental survey in the office of the surveyor general, can at the instance of an adverse claimant be taken up, and, although its investigation results in no action unfavorable to its validity,

may be held to take date only from the time of this final determination of the department in the last resort. A title in this way may be postponed, until those who have an interest in keeping up a protracted controversy about it have succeeded in procuring a survey favorable to themselves. A judgment appealed from is nevertheless a judgment until it is reversed; and if not reversed at all, all acts done under it and all liens acquired by it stand good from the date of the judgment. The survey of Brown was an approved survey in 1834, and the appeal from its approval in 1839 having been dismissed it stands as a survey of that date.

We do not consider it important to express any opinion as to the effect of the secretary's exclusion of the tract of 1702 acres reserved for the military post at Jefferson Barracks. The government of the United States and the inhabitants of Carondelet being agreed about this, it is not a matter for third persons to contest. We are not called upon to say whether this reservation could of itself have any effect or not; nor is there any thing in this record to show the history of this title.

In relation to the alleged discrepancy which is said to exist between Brown and Rector's surveys, it is sufficient to observe that the government of the United States has acquiesced in Brown's, which is said to embrace more land than the other; and the confirmation to Cerré's representatives is within either.

Our conclusion is, then, that Brown's survey, being a legal and approved survey in 1834, must prevail over a title emanating from the United States two years afterwards.

In McGill v. Somes & McKee, 15 Mo. 87, this court held that " when a survey is made and passes through the examination and receives the sanction contemplated by law, it is conclusive on the government. It is in like manner conclusive upon all persons who claim title to the land under titles originating subsequently to the survey.

It is no longer a question that confirmations under the act of July 4th, 1836, do not relate back to the date of the

original Spanish concession so as to exclude intermediate grants, but that they take effect only from the passage of the act. The confirmation of the Carondelet commons was made by the act of June 13, 1812, and the location by a survey made at least as early as 1834. " These laws," (the acts of 1812 and 1831) says Mr. Justice Catron in Le Bois v. Brammell, 4 How. 464, " and the acts done by the United States in pursuance of them, we suppose, made and located the commons title as effectually as a patent could have done, and brought it within the exception of the act of 1836." In Menard v. Massey, 8 How. 293, the entries and patents of Massey in 1826 and 1827 prevailed over a confirmation under the act of 1836.

We are not to be understood as deciding that the survey of 1834 would not relate back to the incipiency of the title in 1812. There is a class of confirmations, such as were passed upon by the Supreme Court of the United States in Cochran v. West, where the grant was indefinite, and its confirmation was accompanied with an order of survey, in which the title would of course take date only from the date of the survey. The title to commons confirmed by the act of 1812 is not of this class; but if it was so regarded, still, as it was located two years before the date of Cerré's confirmation, it must prevail. Nor is it to be understood, because the date of Rector's survey has not been adopted as the date of the Carondelet survey, that our opinion is that the executive officers of the government can, after a lapse of twenty-two years, take up a survey for revisal. Twenty years' possession of land, under a claim of right, gives title here; and although no statute of limitations runs against the United States, and no definite period appears to be fixed by law within which the acts of subordinate officers may be revised, we are not prepared to say that twenty-two years would be a reasonable delay.

We have refrained from any discussion of the title of Carondelet as it existed under the Spanish government, or as it was brought to the attention of the board of commis-

sioners previous to 1812. For my own part I have never been able to perceive any greater difficulties or less merit in the claim of Carondelet than in those of St. Charles and St. Louis. The great obstacle to its early recognition as a valid title seems to have been created by the blunder of the persons who first presented the claim to the old board of commissioners in estimating its area at six thousand arpens. This mistake is not difficult to account for, if we adopt the suggestion made at the bar in the argument of this cause, that the depth of the common field lots was supposed to be the measure of the northern line. These lots being forty arpens in depth, and the starting point for the western line being fixed at their extremity, and the length of that line being one hundred and fifty arpens, the area produced by the northern and western lines, meeting at right angles, would be exactly the quantity claimed. But the common field lots did not extend to the river; and just below them the river deflected considerably to the east, and the line of one hundred and fifty arpens, as fixed by Soulard, instead of being made parallel to the river, was made to conform to the lines of Alvarez and Reihl, so that the metes and bounds included greatly more than the quantity claimed. But these questions can not be regarded now of any practical importance. The act of Congress of June 13, 1812, undoubtedly confirmed the commons of Carondelet; the government has pointed out by a survey the locality of the confirmation, and Carondelet has received the survey. This was done at least as early as 1834, and a claimant under the act of 1836 can not dispute this survey.

Judge Richardson concurring, the judgment of the circuit court is affirmed.

Scott, Judge, dissenting. Although the plaintiff Dent stands on the record in the attitude of one seeking to eject the defendants from their possession, yet, from this record and others agreed to be made part of it, it appears that he was the prior occupant of the land in controversy, it being a

part of a larger tract confirmed to him by the act of Congress of the 4th July, 1836. His controversy is in reality with the city of Carondelet, as the defendants claim through her. The possession of the plaintiff was long prior to any lease of the land in suit by the city of Carondelet, by whom it was claimed as a part of her commons confirmed by the act of Congress of June 13, 1812. The defendants obtained possession with a full knowledge of the rights of the plaintiff. These facts are stated, not with a view to affect the law of the case, with which they have nothing to do, but to meet any complaint of hardship which may be made against disturbing long continued possession. The record shows that if such complaints are to be indulged in, they would come more properly from the plaintiff than the defendants.

This is the third or fourth time that the claim of the plaintiff has been before this court, and there never has been an adjudication hostile to it. He claims under a confirmation by the act of July 4, 1836, and an approved survey thereon. Carondelet and those claiming under her maintain that the land was confirmed to her as a part of her commons by the act of June 13, 1812. The ground on which the right of the plaintiff has been maintained is, that having a confirmation by the act of Congress with an approved survey, his title is a better one than that of Carondelet resting on a confirmation alone, though a prior one, without an approved survey; indeed on one which has been disapproved. This court has held that under the act of June 13, 1812, there may be a recovery on a title by confirmation without a survey, as that act conferred a legal title. (Funkhouser v. Langkoff, 26 Mo. 453.) This opinion is fully sustained by the case of West v. Cochran, 17 How. 476. Indeed that case is the foundation of the opinion. But, notwithstanding this, there is a class of cases in which the Supreme Court of the United States has held that when a confirmation is vague and indefinite as to its boundaries, a person obtaining a complete title from the general government after the confirmation but before there is an approved survey will hold it against the

confirmee. Such are the cases of Menard's heirs v. Massey, 8 How. 293, and Cousin v. Blanc's Exec'r, 19 How. 202.

But this case, as presented to us, does not raise the question whether Carondelet, on her confirmation alone without an approved survey, could have made a defence against the title of the plaintiff, as the only instruction given was that, "if the land in controversy is within the survey of the common of Carondelet made by Rector in 1817 and that made by Brown in 1834, the plaintiff is not entitled to recover in this action." Nor did any of the instructions asked by the defendants put the question to the jury whether the claim of the plaintiff was a part of the commons of Carondelet. The case was made to turn on the survey, and not on the fact whether the claim of the plaintiff was a part of the commons. If the third instruction asked by them was intended for this purpose, it was clearly erroneous; as may be seen by comparing it with the instruction given in the case of Mackay v. Dillon, 4 How. 448, for which instruction the judgment was reversed. It took from the jury the question whether the lands were commons or not, and assumed that land might be confirmed by the act of June 13, 1812, whether or not it was commons. That act confirmed to the inhabitants of the villages therein named only commons; and whether land was used as commons prior to the 20th of December, 1803, was a question for the jury. The evidence in the case shows that there was a prior valid title within the boundary claimed for the commons. It also shows that there were concessions within the boundary prior to the date of the paper asserted by Carondelet to be the grant of the commons.

But it is understood that the majority of the court, without controverting the validity of the claim of the plaintiff as it has heretofore stood, maintains that the survey or surveys of Rector and Brown were approved by the opinion of the Secretary of the Interior of February 26, 1855, without inquiring into the regularity of this evidence of title made after the action was begun. An examination will be made to ascertain whether the letter of the secretary can possibly be

construed into such an approval as will affect the rights of the plaintiff in this action. The opinion of the secretary was enclosed in a letter written by the commissioner of the General Land Office and addressed to the surveyor general of Missouri. This letter has been published, and its exposition of the opinion never contradicted. If this letter of the commissioner is to have any weight, prepared under the circumstances it was, with the full knowledge of the secretary if not by his directions as we may suppose, it is not conceivable how a doubt can arise as to the meaning of the secretary's opinion. It leaves no room for even a cavil. The concluding words of that letter are : " You will also declare, in your approval of the Carondelet commons survey, that, as regards the rights of all other claimants within the limits of that survey who hold adversely to Carondelet, your approval is in no manner intended, nor shall it be construed, to interfere with the rights of adverse claimants to seek a judicial settlement of their several interests." But does the opinion of the secretary stand in need of any explanation ? He says : " My decision therefore is that the survey of 1816 or 1817, as retraced by Joseph C. Brown in 1834, should be sustained, excluding, of course, the 1702 acres heretofore set apart and reserved for the use of the military post at Jefferson Barracks ; and that the parties claiming adversely to Carondelet should not be hindered thereby from establishing and settling their rights before the judicial tribunals of the country." Can language be plainer than this ? But if any doubt can arise as to the meaning of this sentence, to be satisfied that it was deliberate and intended its obvious purport, we have only to look to the extract from the opinion of the Supreme Court of the United States cited by the secretary from Mackay v. Dillon, 4 How. 446. It is in these words : " The act of Congress of 1812 confirming the claims to commons adjoining and belonging to the town of St. Louis did not define the extent and boundaries of these claims, nor adopt the evidence laid before the commissioners for that purpose. The boundaries of the claim thus confirmed were designedly

left open to the settlement of the respective claimants by litigation in the courts of justice or otherwise." The letter of thé commissioner, by its terms, shows that he is the organ of the secretary, through which he gives directions for carrying out his opinion. That officer directs the surveyor general of Missouri to make the approval of the survey and the terms in which it shall be done, being those above stated. The approval was accordingly made by the surveyor general, with a reservation of the right to private claimants to resort to the courts of justice to adjust their respective claims, as will be seen by reference to his approval endorsed on the plat of the survey of the commons preserved in the bill of exceptions. So that the only approval of the survey that has been made is one in which it has been expressly declared that it is in no manner intended, nor shall it be construed, to interfere with the right of such private claimants as hold adversely to Carondelet " to seek a judicial settlement of their several interests."

Indeed it seems too plain to admit of any doubt that the secretary's approval of the survey was not intended to affect in anywise the right of the plaintiff to his confirmation within the limits of that survey. The only question that can arise on the opinion of the secretary is, whether it is competent to him to give a qualified approval ; whether his approval, restricted as it was in its operation, could be sustained ; and whether, although restricted in its terms, it would not operate as though it was absolute. But no ground is perceived on which a question can arise as to the exercise of this power by the Secretary of the Interior. The extract from the opinion of the Supreme Court in the case of Mackay v. Dillon, above cited, furnished ample authority for the course pursued by that officer. The control retained by the government over the public surveys is for the preservation of its rights. If the government is satisfied so far as its rights are concerned, why should it go farther, and endeavor to conclude by the acts of its officers individuals from the assertion of their claims. So far as the government was concerned, it

was satisfied with the survey of the commons, reserving the Barracks and the adjoining land—declaring at the same time that, if there were any rights belonging to individuals hostile to those of Carondelet, it did not intend thereby to interfere with them.

In the case of Menard v. Massey, 8 Howard, 314, the Supreme Court of the United States, speaking of the conclusiveness of a survey not appealed from as to the United States, says: " But private claimants of lands within its boundaries, who were no parties to the survey, are not estopped, and may controvert its conclusiveness so far as their claims interfere with the lands thus selected by the party and which were laid off to him by the United States." According to the decision of the Supreme Court of the United States in the case of Le Bois v. Brammel, 4 How. 449, an unqualified approval of a survey would have been equivalent to a patent; and being such, the rights of those claiming under a confirmation by the act of the 4th of July, 1836, would have been concluded, as it has always been held that a confirmation under the act of 1812, with a valid survey, is a better title than a confirmation under the act of 1836 with a like survey. As the approval of the survey is an act of the understanding, and as it is evident that the act of the officer, in approving the survey of the commons so far as the United States were concerned, did not intend to affect the hostile rights of claimants of the commons, on what principle can it be maintained to have that effect, but that there could not be any other approval than an absolute one? .But as the survey of the commons never has been approved so far as adverse claimants are concerned, how can an imperfect and incomplete approval be construed into a valid one? All that can be said is that an approval affecting the plaintiff has never yet been made, and it is still to be done. The survey as to the plaintiff stands yet unsupported by an approval; but if the government, through her officers, can not make any other than an unqualified approval, on what ground was the approval made reserving 1702 acres on which the Barracks

stand ? This ground had not been reserved when the act of 1812 was passed. The Barracks were not commenced until a great many years afterwards, and in this respect the United States were in no better a situation than private claimants ; for, if the title by the act of 1812 passed to Carondelet, the government could not afterwards appropriate the land. (Sigerson v. Hornsby & Dent, 23 Mo. 268.) Surely the case of Michell v. United States, 15 Pet. 52, to which reference was made by the Secretary of the Interior, can not be applicable here, as the Barracks were begun after 1820, long after the Spanish laws had ceased to have any effect in Missouri. The government of the United States, in conveying lands by patent, limits their effect so as to make them operate as quit-claims as to it, leaving the rights of others to the lands patented to be settled and adjusted by the courts. An instance of such a patent, which was approved by the Supreme Court of the United States, is to be found in the case of Bryan et al. v. Forsyth, 19 How. 336.

It was maintained in argument before the defendants that, although the survey was not approved by the secretary so as to operate adversely to the rights of the plaintiff, yet the surveys of Rector and Brown stand as approved surveys under the laws of the United States irrespective of the action of the Secretary of the Interior ; and being so, they show a right in the defendants superior to that of the plaintiff. If this proposition is correct, the consequence drawn from it can not be controverted. There is some confusion in the argument as to the surveys of Rector and Brown. Sometimes they are regarded as one and the same ; sometimes as different surveys, or at least that the survey of Rector by itself without any aid from that of Brown is valid. The object to be attained by thus presenting the survey is to show, that, as the survey of Rector was made as early as 1816, it could not be set aside after so long a period as that intervening between the time of its being made and the time of setting it aside, a space of more than twenty-five years.

The survey of Rector as it stands unconnected with that

of Brown will be first considered. The act organizing the surveyor general's office for Missouri was passed April 29, 1816. It is admitted that, in order to be valid, the survey must have been by virtue of this law. Now that survey was made in 1816, as appears by the testimony of Milburn, a witness for the defendants, but whether before or after the 29th of April of that year nobody knows. It was agreed that the record of the suit of Bingham v. Dent, a report of which is to be found in 8 Mo. 569, might be read in this case. That case, as is apparent from the report, was prepared by the counsel on the part of Carondelet, who was represented by Bingham, with great care, and there is a long array of papers and documents in support of the claim of Carondelet; yet, as the cause is reported, there is no allusion to the survey of Rector. Brown's survey at the time of the trial had been set aside, and surely, if ever, then there was need of the survey of Rector. If the survey at that time had been regarded as valid, it is difficult to conceive why it was not then produced. It can not be maintained that it was unknown. The clerk, who had seen the field notes of the survey the year after it was made, was then the surveyor general, or, if not, he was still in the office. The fact that the existence of the paper was not known, or that it was forgotten, is a strong argument against it. The survey would not close; it could not be platted. It could not then be lawfully received; and we must presume a violation of duty in a public officer to come to the conclusion that it was approved. No doubt errors were discovered after a survey had been approved. But take the testimony of Milburn, who was in the office from 1818 till 1841, and was part of that time surveyor general, a witness for the defendant, and that of A. H. Evans, a clerk in the office from 1822 till 1836, a witness for the plaintiff, and we must come to the conclusion that there was no regard paid to the survey of Rector until Brown was ordered, in February, 1834, to connect it with the adjoining lands. The testimony of Milburn, who seemed from the documents in the cause to have felt a

decided interest for Carondelet, is conflicting. He says, the field notes of Rector, though in the office, were never acted upon until the date of the surveyor general's order to Brown in 1834; it lay in the office unnoticed until 1834, when it was jointly approved with Brown's survey; that the paper in evidence as Rector's survey is not a recorded survey and forms a part of his official reports on the subject of the Carondelet commons; that surveys were not paid for till examined; thinks this survey was paid for, and that he made out the account; that the lines of the survey would not close, there being a considerable discrepancy; if it was as great as stated he would not approve the survey. Spalding, a clerk in the office, testified that the discrepancy was as great as it had been represented to Milburn. Milburn further stated that a survey was never approved until it was examined, and that he thought Rector's survey was never examined until Brown's survey was made in 1834. A clerk in the office testified that Rector and Brown's survey bore the same number. This being the evidence in support of the survey, can the evidence of Evans, the witness above named, fail to show in what light Rector's survey is to be regarded? He was engaged in the office in platting and examining work. He saw Rector's notes and never regarded them as official, nor ever used them; it was a private matter of Rector; and was told by him, or the surveyor general, that the survey was made for Rector's private use to enable him to locate New Madrid certificates; that his situation in the office enabled him to know what papers were official; that he was familiar with the contracts, orders and instructions to surveyors, and never saw any contract concerning, or order to make, this survey; that his duty was to number and file field notes, but, as he thought, he never filed or numbered those of Rector.

The testimony of the other clerks as to the manner of doing business in the office in later times, and of the great looseness in the practice of the office during the time of which we are speaking, can not materially affect the other evidence

in relation to the authenticity of Rector's survey. It does seem that the declaration of Milburn that the notes of Rector's survey were not noticed until 1834 ought to be conclusive on this subject.

It is conceived that enough has been said to show that Rector's survey by itself can not be sustained as a legal and official act. It is a matter of no concern what weight is given to it in connection with Brown's survey. It must be considered as only coeval with that of Brown, and stand upon the same footing as regards the supervisory powers of the officers of the general government over the public surveys.

Our order next leads us to the consideration of Brown's survey. That survey was made in 1834, and during the same year was approved by the surveyor general. It was not certified to the General Land Office till 1839, and then in pursance to an order from the Land department. The main question discussed in relation to this survey was, whether, under the circumstances, the survey, having been made before the act of 1836 reorganizing the Land department, it was subject to the revisory powers of the officers of the general government. It seems to be admitted that when a survey is made and approved by the surveyor general, a party affected thereby may appeal to the Land department. But in what time this appeal must be taken, when the injured party has had notice of the survey; how long he must be allowed to appeal when he has had no notice; or whether he is in the usual exceptions of the statute of limitations; whether the officers of the government can at any, or within what, time interfere with a survey from which there has been no appeal; whether the failure of the surveyor general to send on a copy of the survey to the Land department affects this right, are questions of great importance, and merit the most serious consideration. As the regulations on this subject must be uniform throughout the states in which the public lands lie, this court can not prescribe them; they must be ascertained and fixed by that tribunal to which belongs the interpretation of the laws of the United States in the last resort. The re-

ST. LOUIS.

cord before us is a sad commentary on the law in relation to the supervision of surveys by the officers of the general government. To see, during a period of fifteen years, one doing and another undoing, one approving, another disapproving, not in subordination to each other by appeal, but each acting independently of the other, as standing in the relation of predecessor and successor, taking up the subject anew without regard to what had been previously done, and these officers being continually changed, affords a gloomy prospect for the stability of titles to real estate. The views expressed in the case of Carondelet v. Dent, 18 Mo. 290, in relation to this subject are still entertained.

But notwithstanding the supervisory power of the officers of the federal government is liable to abuse, our experience and observation teach us that the existence of such a power is necessary. It would lead to too great injustice and oppression if the acts of the surveyor general were final and conclusive. The existence of such a power serves as a check on that officer ; and a knowledge that his conduct can be reviewed and his errors corrected serves as a moral restraint, and frequently prevents the necessity for its exercise. It would be observed that Brown's survey was made and approved in 1834. The act of May 26, 1824, was therefore in force, which required that the vacant lots mentioned in the act of 1812, under the instructions of the commissioner of the General Land Office, should be surveyed, designated and set apart for the support of schools in the towns and villages. No reason is seen why the survey of the commons, mentioned in the same section and in connection with the vacant lots, should not be surveyed also under the like instructions. The phrase in that section " under the instructions of the commissioner of the General Land Office" apply as well to the commons as to the vacant lots. If the commons were to be surveyed without directions from the commissioner and to be designated as the private lots, why were they not mentioned in connection with those lots in the first section of the act ? Be this as it may, it is impossible to deny that, from the evidence in the record,

the testimony of the officers in the surveyor general's office, the various instructions from the Land department as published in the Land Laws (2 vol.) of the date of 1838, prepared and printed by order of the Senate, that a supervisory power over surveys has been exercised in some manner from the time of establishing a surveyor general's office in the United States. This power would seem to result from the structure of our federal executive, who is charged with the duty of seeing that the laws are faithfully executed, and who, in the absence of legislative regulations, must see that his subordinates do not trample down all right and justice.

The act of April 29, 1816, providing for the appointment of a surveyor of the public lands in the territories of Illinois and Missouri, made it the duty of that officer to cause to be surveyed the lands in the said territories which have been or may hereafter be confirmed by any act of Congress, which have not been already surveyed according to law, and to forward copies of the plats of the surveys to the commissioner of the General Land Office. The plat of Brown's survey was not forwarded to the Land department until the year 1839, it being made in 1834. The plat was forwarded by an order from the department, and on the 20th January, 1841, the department notified the surveyor general of Missouri that the survey was disapproved. One of the causes of this disapproval was, as this record shows, that the United States Barracks are within the limits of Brown's survey. The government claims, as appurtenant to those Barracks, upwards of 1700 acres of land, all within the survey. The Barracks were erected by appropriations of money made by Congress, and a beginning of them was made prior to Brown's survey. The laws of Congress in relation to this subject disclose this fact. Under these circumstances was there any authority in any officer of the government to approve a survey, the effect of which was to pass the title to lands which had been appropriated by Congress? If the approval by the surveyor general of Brown's survey concluded the plaintiff, it equally concluded the United States, for the title to the commons

34—VOL. XXIX.

dates from the act of June 13, 1812, long before there was any appropriation by Congress for the Barracks. Any secret arrangement at the time, or a subsequent one, between the officers of the government and Carondelet, by which the claims of the United States were secured, thus making the survey harmless to them but binding on the private claimants, was a disgrace to all those concerned in it; and it would be a great outrage to permit an approval obtained by such means to have the least weight or authority against the plaintiff. Whatever may be the law as to the power of the officers over surveys, under the peculiar circumstances of this case, I am not of the opinion that the survey of Brown stood as an approved one when it was first interfered with by the Land department.

If the approval of the survey by the Secretary of the Interior, in February, 1855, was designed only to affect and conclude the rights of the United States, leaving the rights of private claimants undisturbed by it and remaining as though the approval had not been made, then it is obvious that the claim of the plaintiff has not been tried on its merits, as the question whether it was a part of the commons has never been submitted to a jury, which is required in an action on a confirmation by the act of 1812, according to the doctrine of West v. Cochran, 17 How. 416. In suits on such titles, the act confirming the title is regarded as a patent, and the party relying on it must produce the evidence which shows that the land sued for is that confirmed by the act of Congress. The history of these commons show that valid private claims might exist within the outboundary of their survey. (Inhabitants of Carondelet v. Dent, 18 Mo. 292.) In my opinion, the judgment should be reversed.